Good morning, Council. Welcome to our virtual world. Good morning. We have a split panel, part virtual, part in person, and of course we welcome you. Let's have Ms. Fuentes, I believe you're up. Can you tell us how much time you'd like to reserve, please? Were you able to hear me? Yes, Your Honor, I apologize. I still had the live stream on. Good morning, Your Honor. It's Karina Fuentes, Assistant Public Defender, on behalf of Appellant Eugene Smith. If I may reserve three minutes for rebuttal. Of course. Go ahead, please. Thank you, Your Honor. There's no question in this case that Eugene Smith was involved in selling counterfeit tickets at major sporting events. The question is, does this raise to the level of a complex or especially intricate fraud conspiracy? And we submit that it does not, that the record does not support a finding that this would rise to the level of a sophisticated, warranting a two-point increase for sophisticated means. Ms. Fuentes, let me understand one thing. One of the factors that the commentary suggests we look to in determining whether or not sophisticated means enhancements should be applied is the duration of the scheme. And that troubles me because it seems to me if a scheme is simple, it doesn't become sophisticated or complex simply because the simplicity continues for a period of time. How do you suggest, and I'll ask Ms. McKeon, probably she's a better one to ask this question, how we should handle that component, the duration? I really wish it wasn't in there because I think it complicates our analysis, but it is there. And again, if something is very simple, to me, to my basic mind, it doesn't change its simple nature really because the simplicity continues, but yet we're instructed that that's not a single factor, obviously, but it's one of the factors we have to consider in looking at sophisticated means and sentencing enhancements. Your Honor, this did take place over about two years, I believe, is what the record suggests. I don't think that's an especially long period of time. He was not charged with a single sale of counterfeit tickets. He was charged with a larger fraud scheme. I think a fraud scheme sort of inherently implies that this is going to go on for some duration of time. I don't believe the fact that he was selling tickets at a number of events over a period of two years would rise this to the level of, on its own, would rise this to the level of sophistication when the scheme is considered in its totality. What about the sophistication of the counterfeit or the replica tickets? I mean, there was a good bit of effort extended to manufacture these tickets. Isn't that correct? Yes, Your Honor. These were well-made replicas. There's no question about that. However, I think inherent in any counterfeit scheme is that there is a product, a fake product that can be sold, whether it's a fraudulent piece of art, a counterfeit ticket, which is our case, fake coins. If the product's not well-made to a certain degree, nobody's going to purchase it, and then there is no fraud. If the standard becomes that a well-made product, you know, warrants this enhancement, then it ceases to be a comparative enhancement. Sophisticated means by the enhancement as it is phrased is intended to be comparative. It's supposed to apply to a more complicated scheme than an average counterfeit. Well, isn't a complicated scheme, shouldn't one think a complicated scheme or a sophisticated scheme is one in which many people may be duped? I mean, this is, I believe you said a few moments ago this happened over a course of years, and these are big events that we're talking about. You know, this isn't like Johnny's playing the guitar at the corner. So it is a printing, admittedly so, but it's a printing to some of the biggest events in the United States, and it was able, with the degree of authenticity that it carried, to fool a lot of people. Why shouldn't that be thought of as an important factor in thinking about sophisticated means? I think it's a three-part answer. First, in terms of the events that he targeted, he picked the most popular events. I myself am not a sporting fan, but I know what the Super Bowl is. I don't think there was anything particularly sophisticated about the events he targeted. He cleverly targeted the events that are most popular. So that, in and of itself, I don't believe points to any sophistication. In terms of the production of the tickets, I, again, look to the commentary provided by the Sentencing Commission to explain the enhancement. And the behavior of producing a ticket simply, I don't think, is equatable to creating multiple accounts, using a pseudonym or an alias to sell these tickets. It doesn't equate with creating offshore accounts or shell companies. Many of the cases that tend to apply sophisticated means seem to focus a lot on the concealment efforts. Well, let me ask you about a recent case, Kirshner, that the government's brought to our attention in their 28-J letter. The facts in Kirshner weren't nearly their argument, the government's argument, weren't nearly as egregious as these facts. And we applied the sophisticated means enhancement in Kirshner. Your Honor, I read Kirshner a little differently, and Kirshner did involve concealment. It involved the use of, I believe, a pseudonym. It involved the use of documentation to legitimize the coins. And I believe there was some offshore. I believe there was a fictitious shell company involved in that case. So I would say that the behavior in Kirshner was more consistent with the examples provided by the Sentencing Commission to define, to explain this enhancement. I actually think that the behavior there was more significant than Mr. Smith was selling his tickets out in the open. He was not hiding behind, you know, a fake name, a fake company. He was, frankly, he was using social media to sell these tickets. If anything, I think you could accuse him of being sloppy rather than sophisticated. Let's change the subject for a moment, and let's talk about the organizer-leader issue. I know that, Abedincio, your argument is there's just not enough here. You know, the court opined in such a brief manner that nobody really could discern what the reasons were. Tell me, what would you contemplate as the minimum that the district court should have said? Because I think the government, in its argument, talks about what's in the record with regard to the facts that could amount to leader, but not what the district court specifically said. So help us with what was said and what should have been said. So, Your Honor, again, and I apologize for doing my multi-part answers, but I do think there's two pieces to that. The first part, as Your Honor said, there's no way for us to know why the district court actually found this enhancement applicable. So I think for purposes of appellate review, it is necessary to at least know what factors in the record the court considered. We just don't know. Something should have been pointed to. This factor supported or that factor supported application of this enhancement. The second part is that we'd submit, even looking at the record, that the record simply doesn't support application of this enhancement. There's none of the traditional factors that normally support a leadership enhancement. There's not continual supervision in this case. Well, didn't he continuously, wasn't there like a quality control element that Smith exercised over the printer? And if he didn't like the tickets, couldn't that be some sort of supervisory responsibility, as it were? No, Your Honor. I don't believe so. I think that's traditional consumer behavior. You know, if you order a product and it arrives and it doesn't fit or it's flawed in some way, you send the product back. Or, you know, I myself recently ordered countertops, and when the installer came, it wasn't what I ordered. I sent it back. That doesn't make me the supervisor of that, of the installers. It makes me a disgruntled customer. It does if you order 2,000 countertops. Well, then I'm running an operation, but I still don't have countertops, for the record. But, no, I, and again, in terms of him supervising quality control, again, I think he's rejecting a product on a certain amount of occasions where the product didn't meet his standards. But I would submit that that's very typical customer behavior. How often does that happen? I don't think the record has a specific number. And in terms of the quality control, I really would ask the court to look carefully at some of the testimony from the printer. And I would point specifically to our appendices around page 163 and 164. And I'm going to paraphrase because it is long testimony, but he has asked, the printer has asked, you used your own artistic skills. And he said, right. And he has asked, did he tell you how to do it? He just said, do it right. And he says, yes. You know, he's asked, you used whatever means you thought were good, correct? And he says, yes. And they asked him, those were your ideas. And he says, correct. The printer's own testimony shows that, you know, Mr. Smith is not consistently supervising these tickets beyond providing certain specifications. He also says, sometimes he would say, I don't like it, right? And there's a conversation about how he had to redo it. And that's at page 164. Correct. And that goes to the idea of rejecting. You know, if you put a customized order in for a product, you know, and I grant you that a wedding invitation or a business card is a legitimate product. But if it is not done to the specifications, you are not going to pay for that product. You're going to ask for a refund or a redo. That does not make you the supervisor of the printer. And this is no different. In fact, I would further argue that Mr. Smith didn't have the technical ability to really supervise them. If he knew how to make these tickets or how to do them, we wouldn't have a printer. He didn't have the technical ability to really. Our review, though, is very deferential. And it may be if this was a de novo standard that we were applying, we'd look at this and say, well, yeah, he rejected a few tickets. But really it was the printer's activity where the sophistication came in, the application of the printer's expertise, the design, not Smith's. But given the deference we have to afford the district court in the application of these enhancements, how can we say that what the district court did here was simply unreasonable in applying that enhancement? Your Honor, I believe deferential review is very difficult here because there's nothing to defer to. There's no explanation. We don't know what factor motivated the court. You know, we don't know that the production of this is what led to this. We don't know what fact in the record, if any, actually made the decision. So I'm not sure that the court can defer to anything in particular in this case. So I'm a little hesitant with the whole idea of deferential review. And, again, I would submit that the process here doesn't amount to leadership because it's not a consistent review. There's other factors that are also missing. But you said leadership. We're talking sophistication right now, which is a different enhancement. I apologize. I thought we were on leadership. Could you repeat the question, then? I'm sorry. Yeah. Well, it's the same issue, really, the amount of deference we have to afford. And can we say the court's application of the enhancement here was so off the wall that was unreasonable? Maybe I would have applied it. Maybe I wouldn't have applied it. Maybe my two colleagues would not have applied it. But does that mean the district court's application of it was wrong? I believe so when you, again, you look at what the intent of this enhancement is, which is comparative. It's intended to be applied not just to any counterfeit scheme that has a good quality product, but rather something that is beyond the realm of a normal, a regular scheme. And in this case, you have Mr. Smith who hires one person to make tickets and then goes to events and sells them, and that's pretty much the extent of this operation. Again, he's doing this very publicly. There's no real attempt to conceal his behavior. So I just, you know, when you look at it. It's a kind of a scheme. He couldn't really conceal it. If he concealed it, he wouldn't get any customers. If he just did these tickets but then didn't go public with the fact he had tickets to sell, he wasn't going to sell any tickets. But he could be hiding behind an alias. He could be selling these online using the dark web or some other sophisticated means to conceal. He could be doing it electronically. He's physically going to these events at very public locations. They photographed him at the Mall of America. Again, I really feel his behavior points more to maybe you could call him brazen. I think you could call him sloppy. But I just don't see how this can be compared to, you know, other schemes where you're talking about multiple, you know, accounts, offshore accounts, shell companies, people setting up fake offices. The behavior just doesn't approximate the level that traditionally merits this type of enhancement. Okay. May I? Oh, sorry. Nothing. Your time's up. I was just looking to ask Judge McKee whether he had anything further. No, I don't. No. All right. Thanks. We'll hear from you, Arun Buttle, and we'll hear from your colleague now. Is it Ms. McKeon? We can't hear Ms. McKeon. Right. Yes, Your Honor. Okay. Good morning. Good morning. Arun McKeon for the government. May it please the Court, I represent the United States in this matter. I'll start by addressing the sophisticated means enhancement. And our position is that there's no question that this was a more complicated scheme than that of an average counterfeit ticket scheme. This, both the nature, scope, duration, in addition, the duration, and the actual tickets themselves were very sophisticated. But didn't the printer design the tickets? Did Smith have anything to do with the design of the tickets, or was that the printer? There's no dispute that the printer used his own techniques to make the counterfeit tickets. Now, if I could back up for a minute, there's a range of tickets involved in this scheme. This went on for two years. There's regular season games. Then there are four, what I would call, premier events, the two Super Bowls, the NBA All-Star Game, and the College Football Championship in 2017. Those tickets themselves were more sophisticated in nature because they contained many unique features that were intended to thwart counterfeiters. Holograms, levels and layers of design, special inks. By 2018 Super Bowl, they actually had to use black lighting to find some of the features. There's no question that the printer, Mr. Ferguson, was the one who used and came up with the techniques to use. Mr. Smith did not tell him, you use the following techniques. But he caused, with respect to sophisticated means, it's either the defendant engaged in the sophisticated means himself, or he caused the use of sophisticated means. And Mr. Smith caused the use of the sophisticated means by the printer. This printer was not an independent contractor who was out there making counterfeit tickets for multiple people, and Smith was one of his customers. He recruited this individual after meeting him and having a long discussion with him about counterfeit tickets. The printer testified he had fooled around with it because he was interested in it from an artistic standpoint, but he had never actually sold any counterfeit tickets or attempted to. So he also knew other people who made counterfeit tickets. So this individual was not engaged in any of this activity before meeting Smith. Once he started his relationship with Smith, Smith was sending him tickets, and he only worked for Smith during this time frame. He did not sell tickets to anyone else. He did not produce tickets for anyone else. But wasn't he in the business before Smith of making replicas? No. That's not what he did? No, he was in the business of making flyers and business cards. He had a printing business. He specifically said that he did experiment with making counterfeit tickets because he knew people who did, and he was curious, but he had never attempted to sell a counterfeit ticket before. He had never attempted to produce one that was marketable. It was more, he actually testified he was not a sports fan. He didn't know what these tickets looked like. He was attracted to the challenge of coming up with artistic designs. And looking at the Super Bowl pictures, and I apologize that we did not put photos of those in our supplemental appendix, but that's because the photos don't do them justice. They are very complicated tickets, as was the other two championship games. So, yes, the printer used his own techniques to come up with this. But it was Mr. Smith who caused him to use these techniques. This would not have happened absent his relationship with Smith. And cause is broad. It is a broad term, and he caused the production of those tickets with those sophisticated features. Well, let's pivot for a moment then to the issue of leadership then, right? We have to have a participant. And when I look at the excerpt from the record as to what the district court said, to say that it's sparse is an overstatement, right? So, wouldn't you agree that while you could argue the merits of whether there was enough for the assessment of a participant, that the fact that there's such a, I wouldn't say a paucity, it's an absence of any findings, we've got to send it back on that basis? Your Honor, I disagree that a remand is required or even warranted in this situation. I do acknowledge the district court didn't say much. He said, I found he's a leader in all of this. But that followed his findings on the sophisticated means enhancement, where he talked about Smith's role and Smith's role with the printer. He mentioned he had to get the printer to do the right thing. But even more importantly, we have to go back and look at what the objection was and what the arguments were that were presented. The defense argument, which appears at pages 170, I believe it's 173 of the appendix, was two sentences. And the objection was, I, Smith didn't tell him how to make the tickets, he just purchased them. That was his sole objection. So, it was the, it was a very narrow objection, and it was based on the fact that Smith didn't tell him how to make the tickets and just purchased them. I have to disagree for a moment. If I'm reading the correct part of the record, and you'll correct me if I'm wrong, I'm looking at page 173, right? And Mr. Cooper is who at that hearing? He's the defense counsel, Your Honor. All right. Yeah, I kind of knew that, but I figured I'd ask. So, he says there are actually three issues. There's the role and the offense, whether he's a supervisor. So, up front, this is an issue, right? So, I'm not quite sure what your point is, because if that's one of the issues that the court must resolve, are we going to set a new rule and say that we've got to look at the entire sentencing hearing and say whether the district court said something about role? Because when it comes to role, he identifies, I'm sorry, the court identifies that part of the transcript where there's a discussion of the leader role, and there's nothing said. So, it's identified by the defense. It's raised with the court, and the court says essentially nothing. So, why isn't that a simple instance of us sending it back and say, you've got to do better? I don't think that the record, I don't think that the record, the judge did say he was the leader in all this. So, he found he was a leader. But what factual support does he give us to reach the same conclusion? The judge doesn't provide a factual support for his conclusion. So, how do we review that? How do we review that? How do we review that? I think you're suggesting we review the entire record and make our own factual determinations. No, I'm saying that the judge's reasoning was apparent from the information that was, the arguments that were presented to him. Mr. Cooper's full statement is whether he's, when he talks about the role in the sentence, he said, well, is he a supervisor? Is he a boss? Is he the leader? Is he the organizer? The judge did say he's the leader. Well, you're asking us to come up with a new rule, right? Because currently our law isn't review the entire transcript, see if somewhere the district court said something about leadership other than he's a leader, right? Because that would be a departure from what our law is now. If you're suggesting that, that's fine. I just want to know. No, I'm not, Your Honor. I think there are many cases where a judge's failure to make specific factual findings would create a problem for the court and make it difficult for appellate review or require a remand. I don't believe that this case is that case. And, again, I focus on the argument that was presented, the government's response. It was very clear that the government was arguing that he was the organizer or leader of the criminal activity with Ferguson, not that he was supervising every aspect of the production process. There was no argument presented to that effect. And this enhancement, the two-level enhancement applies if the defendant occupies any of those roles, meaning organizer, leader, supervisor, or manager, and then the rest of it is dependent on the size of the number of participants. But here the judge said leader, the government argued leader, and the defense argument really focused on supervision. So I think the record is clear that the judge's reasoning was, I'm accepting the government's argument and I'm rejecting the defense position that he did not supervise this defendant so as to justify application of the enhancement. So that's how we read the record. If the court had said, in reaching my determination with regard to leadership, I'm adopting the government's version of the facts, that would be a different story, but that's what happened here. I get your argument. It's just, you know. I mean, the bottom line is we think that the record makes the judge's reasoning clear enough, and if the court disagrees, of course, it can remand the issue. I don't think that there would be much of a discussion that would be had if we come up with the same result, but, you know, it's up to the court. Are there other questions on the sophisticated means enhancement? I have none. Actually, I think we're all good. Okay. Thank you, Your Honor. No, thank you. The thing we didn't cover is loss. I mean, loss is a concept which often befuddles me, and the disparity here, the gap between the actual loss and the theoretical amount of loss given all the tickets, and I guess we don't even know about all the tickets. The tickets that were sold that are not included in the $173,000 because, am I wrong, we don't really know how many of these tickets were sold? Your Honor, we do not know the exact number. No, absolutely not. However, the government's loss number was based solely on tickets that could be directly tied to Mr. And that was because they were recovered from victims, because there were text messages about those specific tickets. The difference and the reason that there was a disparity between the actual loss and the estimated intended loss was because the government took even a further step and was even more conservative and interviewed every single person to make sure that we got the exact amount that they had paid for that particular ticket. So the government couldn't reach out and interview every single individual who may have been identified as purchasing one of his tickets. So that's why the actual loss number is closer to $78,000, while the estimated intended loss was $173,000. That itself is extremely conservative because, again, the government required a direct evidentiary link between Smith and those tickets. So we feel that the loss was entirely reasonable, conservative, and probably didn't even fully capture the pecuniary harm in this case, but we think the judge's loss finding is well supported by the evidence. All right. Thank you so much. Thank you. We'll hear from Ms. Fuentes on rebuttal. If you want me to follow up on loss amount. Could you briefly? I don't want to use all of your minutes on that, but if you could just briefly respond to what Diane said. Yes. I disagree with the suggestion that it was necessarily a conservative amount. In terms of just looking at what was presented on the record, the government used the retail value or the face value of the ticket and sort of extrapolated from there, saying, okay, these amount of tickets were sold or were produced or were printed, and we're going to multiply by the face value of the ticket. What's wrong with that? So if you look at, say, the PSR, and I'm looking at Paragraph 7 of the PSR now, which talks about one of the – sorry, it's Paragraph 12. They're talking about, say, Super Bowl 51, I believe. And they're saying there was a controlled purchase there. And they're saying eight tickets were sold and Mr. Smith was paid $1,200. However, the face value for those tickets was actually $2,300. So the price paid was about half of what the face value was. However, when calculating the loss amount, they used the face value, not what was actually made. Okay? So that's a huge difference. If you're now applying this face value and that isn't what was paid, that's a very big difference. The commentary does say that the court should use the greater of the two losses, though, doesn't it? Yes, but subsequent to me submitting my opening brief, Kirshner was released, where it's a similar situation where counterfeit tickets – sorry, counterfeit money was used. And they tried to use what was the correct way of calculating this. Was it the price that was paid or was it the potential value of the coin? And I think there, a panel for this court said you have to show by a preponderance of the evidence that the seller or the counterfeiter intended to sell the product for a certain price. You can't just assume an estimate. So I think that sort of trumps the commentary in this case, and that has to be the prevailing factor here. But why would we assume that the seller would be selling the tickets for anything less than the face price? In fact, these kinds of games, it would be fair to assume that they could well have been scalped. That's not playing in here. But they could have been sold for much more, for multiples of the face value, and that's what usually happens, even with legit tickets. If I go out and buy ten tickets to the Super Bowl next year. Here I think you have concrete examples. You have the one I just gave you. We have another one, Your Honor, where it's a different Super Bowl, where the face value of the tickets was approximately $2,300. Eight tickets are sold for $1,200. In other words, half the price, approximately half the price. If you go to the Army-Navy game, that's another example. I believe each individual ticket had a face value of about $95. Thirty tickets were sold, which would have been $2,850. The price paid was less than half of that. I believe he received $1,000 for those tickets. So you have actual concrete examples where he is selling them for less than face value. If you look at the chart, it's included in the government supplemental memo. It's what they use at sentencing where they have the victim, they have the price paid, and they have retail value. What is missing from there is how many tickets were sold to each individual victim. So in some cases you have the actual loss being less than the face value. In some cases you have the loss being more than the face value. But we don't have information. If somebody bought four tickets, then the price paid might be less. My point is the record shows that he did sell tickets for less, and there could be occasions where he's there, he's selling these tickets. At some point as the game is approaching, he wants to offload them. So you can't really say here, and you cannot assume by a preponderance of the evidence, that he was only going to sell them for face value when you actually have concrete examples of him selling it below. So I believe this has to be remanded for a proper recalculation and a determination of what was he intending to sell or a closer approximation of what he was trying to sell it. Because, again, you have a recent decision from this court saying you cannot assume an estimate provided by the government is the actual amount he intended to sell it for. First, there's a big difference because bullion has no – it's hard to affix a dollar amount to that. Here, the ticket on the face of it has the actual amount. Given the language, again, about using the greater of two amounts, I guess I'm struggling with why it wouldn't be reasonable, let alone fair, but reasonable. So the government would say, okay, the face value of these tickets, of the given ticket to the Super Bowl is, say, $2,000. It was sold for half of that. But the intended – the theoretical loss to the league, to the NFL, however they work up that pie, is the face value of the ticket, not what he sold it for. Because I think Kushner still was interpreting it to be 1.1, even if it was a different counterfeit product. And, again, you have concrete examples. You're suggesting – you know, the suggestion is that he can be hit with a higher intended loss, even though he actually sold it for less. If he happened to – the intended loss. He can be hit with an actual loss, which is greater than the intended loss. Sure. So the actual loss or the actual harm that he caused is significantly less than what he was finally attributed to, the speculated intended loss. You know, there's concrete examples here of him, and there's probably more, again, because that victim chart doesn't tell you how many tickets each individual was purchasing. I have a question now that you've raised this. Okay, I buy a ticket. It has a face value of 2,000. I pay 1,000. It's a counterfeit ticket, and I am denied admission. So that's not relevant in this calculus? We should just look at the $1,000 as the actual loss? Yes, here I do think this is – loss calculation is a monetary calculation. And, you know, again, the reason this is such a big issue and why I think it has to be remanded is you have to bear in mind that by using the alleged intended loss versus the actual loss, his sentence was significantly increased. This wasn't a small increase. This was a significant factor in sentencing. All right, we've got your arguments. Anything further? Judge McKee, anything further, sir? No, nothing. All right, well, thank you both, counsel, for excellent arguments, and we'll take the matter under advisement. Have a good day. Thank you, counsel. Thank you. Judge McKee, we'll call you in, say, five minutes. Okay, that's good. I'll move to a bit of surreception for myself. Very good. Great. You've got the number, right? I have your number, yes, sir. Okay, great, thanks. All right, bye-bye. Bye.